# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE
APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2049-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

K.W.,[1]

     Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

December 17, 2025

APPELLATE DIVISION

     Argued September 9, 2025 – Decided December 17, 2025

     Before Judges Firko, Perez Friscia, and Vinci.

     On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Accusation No. 23-07-0582.

     Philip Nettl argued the cause for appellant (Benedict Altman and Nettl, LLC, attorneys; Philip Nettl, on the briefs).

     Elizabeth K. Gibbons, Assistant Prosecutor, argued the cause for the respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Elizabeth K. Gibbons, of counsel and on the brief).

---

[1] We use initials to protect the identity of a victim of sexual offenses. R. 1:38-3(c)(12).

The opinion of the court was delivered by

VINCI, J.A.D.

Defendant K.W. appeals from a March 11, 2024 judgment of conviction entered after a jury found him guilty of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1), and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b), and an order entered the same day denying his motion for a new trial. We affirm.

I.

We summarize the facts and trial testimony relevant to the issues raised on appeal. The State alleges that on July 4, 2019, defendant sexually penetrated his adult niece, J.G., at his home in Woodbridge Township without her affirmative and freely-given permission. Defendant concedes he sexually penetrated J.G. but contends it was consensual. On January 12, 2022, a Middlesex County grand jury returned an indictment charging defendant with second-degree sexual assault and fourth-degree criminal sexual contact. The indictment charged that defendant committed sexual assault by perpetrating "an act or acts of sexual penetration upon [J.G.] by means of force or coercion."

Effective January 21, 2020, the sexual assault statute, N.J.S.A. 2C:14-2(c)(1), was amended. Where it previously provided a person is guilty of sexual assault if the person commits an act of sexual penetration "us[ing] physical force

or coercion[,]" under the 2020 amendment a person is guilty of sexual assault if the person "commits the act using coercion or without the victim's affirmative and freely-given permission[.]"

On July 5, 2023, two weeks before trial, the court granted defendant's motion to dismiss the indictment due to allegedly incorrect grand jury instructions. For what defendant describes as "tactical reasons," that same day he executed a written waiver of his right to an indictment and "request[ed] to be tried on accusation." The accusation, unlike the indictment, alleged defendant committed sexual assault "by using coercion or without [J.G.'s] affirmatively or freely[-]given permission[.]"

At trial, J.G. testified that on July 4, 2019, she flew to New Jersey from Florida, where she lived with her children and then-boyfriend, to attend her grandmother's birthday party at her assisted living facility. J.G. arrived at the party around 2:00 p.m. Her mother, sisters, and maternal family, including defendant, also attended. J.G. had "[m]aybe about two glasses of wine" during the party. She "felt fine" after drinking the wine.

At some point, her mother and sisters left the facility. J.G. stayed to spend time with her grandmother and extended family. She planned to spend the night at her mother's house and return to Florida the next day.

Around 5:00 p.m., J.G. accompanied her grandmother to the dining room and then returned to the hall "where [they] were having the . . . party." J.G., defendant, his son, J.G.'s aunt, and her aunt's boyfriend were present. Defendant asked "if anybody wanted to take shots or take something stronger, and [they] agreed." "[Defendant] went down and bought alcohol, bought Fireball, and brought it back to the hall." "[H]e brought back two bottles . . . a bigger bottle and . . . a smaller[-]size bottle."

Defendant "poured [J.G.] a shot, but the shot was in . . . a regular cup." The "shot was really big, so [J.G.] asked [her] aunt if she wanted to share the shot with [her], because it was . . . a big cup of alcohol." J.G. "poured half of it into another cup for" her aunt. After the first shot, she "started . . . to feel . . . a buzz, but . . . did[ not] feel drunk or anything." Defendant poured J.G. another shot after "[m]aybe . . . [thirty] minutes[,]" which "was[ not] as big as" the first shot. "After the second shot, [she] started feeling bad. [She] started feeling woozy, kind of foggy. It was . . . starting to really hit [her] hard."

"[W]ithin a couple minutes . . . , [J.G.] was ready to go. [She] was[ not] feeling well. . . . [She] did[ not] expect it to hit [her] that hard, so [she] was ready to go." J.G. asked her "aunt if she would drop [her] off [at her mother's house], but there was no space in the car." She said "[she] would . . . take an

4

Uber[, but defendant] suggested . . . [she] go to his house first, and then from there take an [U]ber." J.G. agreed. She "was getting progressively worse . . . . Like, foggy. . . . [I]t was a very weird feeling. It[ was] nothing [she] had ever felt before. It was just like a foggy feeling." She was "aware of everything that was happening . . . [but] just felt foggy."

She was "feeling pretty out of it" when she left the assisted living facility with defendant and his son. When they arrived at defendant's house, she "walked [herself] in." She sat "on the sofa, but . . . did[ not] sit straight up[] because [she] was[ not] . . . feeling well." She was sitting "there for a few minutes" when defendant "reached over, grabbed [her] legs, . . . pulled them on to his lap[,]" and started "caressing" her legs "[f]rom [her] knee down."

Defendant "mentioned something about taking a drug." He said "[he] ha[d] something that [she could] take. It[ would] make [her] feel better." She agreed and "[h]e sat [her] up, because [she] could[ not] even sit up. . . . [She] saw it was . . . [a powder] in a little jar[.]" "[H]e put it on his hand and . . . explained [she] just had to come to his hand and just sniff." J.G. "inhaled it through [her] nose." "After [she] took it, . . . [she] felt . . . a very hot feeling all over [her] body" and "immediately just laid back down." Defendant

asked "if [she] wanted to do it again, and . . . [she] said no.  But [she] . . . could hear that [defendant] was still using it."

Defendant's son "came into the living room.  At this point, [her] eyes [were] closed, so [she] [did not] see what[ was] happening, but [she] hear[d] everything that[ was] happening. . . . [Defendant's son] asked [defendant] if he could drop him off . . . at a friend's house."  He "said yeah.  And then he put [her] legs down and they left the house."

After defendant left, J.G. called her then-boyfriend, B.C., in Florida to tell him she "was[ not] feeling good" and "want[ed] to leave."  After she spoke with B.C., she "got up from the sofa and . . . was looking for somewhere to lay down."  She "went into the very first room.  There was a mattress.  It did[ not] have sheets on the bed, but [she] laid down on the bed."  She called B.C. again and "then [she] just kind of knocked out.  [She] just fell asleep."

Defendant woke her up and said she "should[ not] lay on that bed because it [did not] have sheets."  He "guide[d her] from the first bedroom into . . . the master bedroom that he share[d] with his wife."  Defendant "was kind of like holding [her]. . . . [Her] arm and the other arm . . . around [her] waist."  J.G. "was[ not] really saying much."  She felt like "[she] was floating . . . like if [she] was on clouds."

A-2049-23

She was "on [her] right side at the edge of the bed" with"[her] head on the pillow." Defendant "c[ame] from behind [her] and la[id] next to [her] and he start[ed] stroking" her "thigh." "[I]t was really difficult to move. [She] kind of said stop and [she] kind of put [her] arm behind [her]." She "remember[ed] trying to do . . . a pushing motion with [her] arm, but . . . [her] arms were like jelly."

Defendant "pull[ed] down [her] underwear[] and start[ed] . . . thrusting. The whole time [her] legs were closed." At first, J.G. "could feel his penis between [her] legs, but not inside of [her]." She was wearing "[her] Apple watch[] on [her] left arm, and it just kept going off. [Her] mo[ther] was calling, [B.C.] was calling, even [her] daughter's grandfather called. It just kept buzzing and buzzing, but . . . [she] could[ not] answer the phone."

"He was . . . thrusting and thrusting, and then he was able to put his penis vaginally inside [her]. And then [she] said stop again and then within like a minute or so, just a few minutes, it just stopped. . . . [H]e just stopped." He asked "[her], are you okay? And [she] . . . did[ not] say anything. [She] was just frozen. [She] could[ not] move. And he kept saying[,] are you okay, girl? Are you okay, girl? And then he offered [her] . . . water and coffee[,] and he kept saying, get up, girl, get up." "[H]e went to the kitchen and he got water."

7

"[W]hen [she] did sit up and . . . tried to drink a little bit of water . . . [she] was . . . frozen" and "could[ not] even move."

"[A] few minutes later, [she] heard [her] mo[ther]'s voice in the house. At that point, [defendant] le[ft] the room and . . . [she] sat up and drank water." She still felt "[d]izzy. Like, woozy. Not as bad as [she] did coming into the room, but really woozy."

Her mother "c[ame] into the room and she ha[d her] phone in her hand and she passe[d J.G.] the phone. And when she pass[ed] [her] the phone, it[ was] B.C. on the phone." J.G. "got really emotional. [She] took the phone. [She] went into the bathroom and [she] was just crying." She spoke with B.C. in the bathroom for "two or three minutes." She told B.C. defendant "raped [her,]" but "did not get into details." She did not "disclose in detail what happened . . . until [she] got to the hospital."

After speaking with B.C., "[she] got up . . . used the bathroom. . . . And then [she] got up . . . left the bathroom and . . . walked out of the house." "As [she] was walking out of the house, [she] passed the phone to her [mother.]" J.G. did not say anything to her mother. She "got in" her mother's car and "just laid in the back seat."

A-2049-23

B.C. told her mother what J.G. told him. Based on that, J.G.'s mother drove her to the hospital to "get [her] checked out." At the hospital, J.G. told the nurse "[she] was sexually assaulted and [the nurse] explained that they were going to do a rape kit[.]" They also collected blood and urine samples. J.G. still felt "that cloudy feeling, kind of feeling . . . in and out . . . just completely out of it[,]" but she "was getting better."

The following morning J.G. was interviewed by law enforcement and gave a recorded statement. She also showed the detectives defendant's text messages from the night before and again that morning asking her to call him. She did not respond to defendant's messages. She also showed the detectives call logs on her phone that revealed a four-minute outgoing call to B.C. at 6:49 p.m. on July 4, and a series of missed incoming calls from 6:56 p.m. to 7:28 p.m. on July 4 from B.C., J.G.'s sister, and J.G.'s daughter's grandfather.

J.G. did not "give consent [to defendant] to have sexual intercourse with [her,]" there was nothing "that [she] can recall doing[] . . . that was non-verbal that may have conveyed . . . consent[,]" and she "[d]id [not] want to have sex with [defendant.]" At the time of the trial, J.G. and B.C. were no longer together.

On cross-examination, defense counsel asked J.G. if "the investigator or the prosecutor [told her] that [her] blood alcohol was only [0.059], which is way

under the limit to even drive?" She testified she was not aware of her blood test results until defense counsel told her during cross-examination. Defense counsel also elicited that in July 2019, J.G. had a prescription for Fluoxetine to treat anxiety and depression and did not "self-medicate with ketamine" or any other drug.

J.W. is J.G.'s mother and defendant's sister. She testified that on July 4, 2019, she left her mother's assisted care facility around 5:00 or 6:00 p.m. J.G. did not leave with her. Around 7:00 or 8:00 p.m., J.W. spoke with B.C. by phone and based on that conversation, decided to go to defendant's house with another one of her daughters to pick up J.G. J.W. "stayed on the phone with [B.C.]" for twenty to twenty-five minutes while they drove to defendant's house.

Upon arrival, J.W. "walked in[to] the house" without knocking and saw defendant "coming out of his bedroom." She did not see J.G. Defendant told J.W. she was in the bedroom and J.W. entered the room. J.G. "did[ not] make any eye contact with [J.W.]. She was . . . leaning over looking in the mirror." J.W. was still on the phone with B.C. and told J.G. that B.C. "want[ed] to talk to [her]." Either J.W. or defendant handed J.G. the phone. Defendant then "turned [J.W.] around and brought [her] into the kitchen."

A-2049-23

While they were talking in the kitchen, J.G. "pass[ed] by . . . quickly[,] . . . did[ not] say anything . . . [and] just handed [her] phone and she left." J.W. "rushed out after her." Defendant "c[ame] out after [J.W.]. As [she] look[ed,] J.G. [was] . . . rushing getting into the back seat of the car. [Defendant] . . . went . . . around towards where [J.G.] had gotten into the car. But [J.G.] . . . closed the door really fast." "[Defendant] was trying to talk to [J.G.]. She would[ not] talk."

They did not discuss what happened because J.W.'s younger daughter was in the car. After J.W. dropped her younger daughter off at a friend's house, she "turned to [J.G.] and . . . asked her what happened." J.G. responded "something had happened between her and . . . [defendant]" and "that [defendant] raped her." J.W. asked "if she wanted to go to the hospital and she said yes. And [they] went to . . . Mountainside Hospital in Glen Ridge."

At the hospital, J.W. told a nurse "[her] daughter had been sexually assaulted[.]" J.W. did not speak with J.G. about what happened, and she was not present when J.G. was examined. The next day, she took J.G. to the Woodbridge Police Department where they both gave statements separately.

Prior to trial, the State intended to call Susan Sechrist, the toxicologist at the New Jersey State Police Office of Forensic Sciences who performed forensic

testing on J.G.'s blood and urine samples, as an expert witness. As a result of a scheduling conflict caused by a power outage at the courthouse, Sechrist was not available to testify. Instead, the State proposed to call her supervisor, Bridget Verdino, as an expert in toxicology.

The State argued, "[t]he testimony would be the same, but it would be coming from the supervisor as opposed to the actual toxicologist." Defendant objected because the State did not serve her resume at least thirty days before trial and they would need "to have a hearing prior to her going in front of the jury to see what her knowledge is in this particular case." The court determined it would "conduct a [N.J.R.E.] 104 hearing" to give the State "an opportunity to lay the groundwork."

At the outset of the N.J.R.E. 104 hearing, defense counsel stipulated to Verdino's qualifications as an expert in toxicology, but "just want[ed] to know how she[ was] qualified to fill in for" Sechrist. Verdino testified she is a "forensic scientist . . . , a toxicology supervisor, and the [quality assurance and quality control] coordinator for toxicology[,]" and she "over[saw] all four labs [in the New Jersey State Police Office of Forensic Sciences.]" Sechrist was a forensic scientist who worked in one of the labs under Verdino's supervision.

12

Verdino peer reviewed the toxicology report prepared by Sechrist in connection with forensic testing of samples of J.G.'s blood and urine taken at the hospital. As a peer reviewer, Verdino "review[ed] all of the notes, all of the data associated with the report, and ensure[d] that the supporting documents [were] present, they[ were] appropriate, and that they support[ed] the report." She initialed the report, signifying that she "agree[d] with [Sechrist's] conclusions and . . . the data within the case reflect[ed] the report appropriately." In her capacity as peer reviewer, she independently "looked at all of the data and determined that the . . . results reported out [were] correct."

Verdino reviewed "approximately [one hundred] pages of notes" kept by Sechrist. Based on her review of the notes, she was able to "ascertain whether . . . Sechrist conducted the testing correctly." She also concluded the testing was done correctly because

> [they] have controls, positive controls . . . that [they] use simultaneously when [they are] analyzing a case, and there is no reason to believe that the test was done incorrectly if the negative control, the positive control . . . reflect the results that they are supposed to.

Following the hearing, defendant did not renew his objection to Verdino's testimony.

A-2049-23

The State called Verdino as an expert in the field of "toxicology analysis" without objection. She testified she "was the technical reviewer" for Sechrist's work in this case and saw "all of her notes." She "peer review[ed] every page of [the] case file[.]" Verdino identified Sechrist's "laboratory report of toxicology analysis for a drug-facilitated sexual assault[,]" which was marked for identification, but not admitted as evidence.[2]

Verdino testified that Sechrist's report reflects "blood alcohol analysis was performed, drug analysis was performed on blood . . . [and] urine, and . . . an amino assay screen was also performed on both . . . blood and urine." "To perform a screen on the blood, there was an ELISA [enzyme-linked immunosorbent assay] and what[ is] called an EMIT [enzyme multiplied immunoassay technique]." She continued:

> [Prosecutor]: And when used by . . . Sechrist in this particular case, what results were found?
>
> [Verdino]: Based on this report, I would be assuming which screens were positive, because I do not have the report for the immunoassay in front of me.
>
> [Prosecutor]: . . . Well, then let's deal with this report. What specific information does the report contain?

---

[2] Sechrist's report is not included in the record on appeal.

A-2049-23

[Verdino]: So this report, we start with immunoassays. It lists the drugs . . . that we screened the blood and urine matrices for. It also lists that we used a gas chromatograph headspace to analyze the blood alcohol content as well as what[ is] called a gas chromatograph mass spectrometer . . . to confirm the drug content.

Verdino explained:

A gas chromatograph headspace is specific for volatile analyses, and, given that common ethyl alcohol or drinking alcohol is volatile, it can be analyzed on this type of instrument. So the gas chromatograph portion of this instrument is . . . a technological instrument that contains what[ is] called a "column." The column looks like a garden hose that[ is] coiled, and it[ is] inside an oven, and as the sample moves through this oven . . . different components of the sample would exit the column at different times based on their boiling point and their structural composition, and then it enters . . . a detector, and we would get a graph, a chromatograph.

According to Sechrist's report, the "results of the blood alcohol analysis was 0.059 percent grams per [one hundred] milliliters with an uncertainty of 0.002 grams per [one hundred] milliliters ethyl alcohol." This meant the value of J.G.'s blood alcohol content "would be[ . . . ].059 plus or minus .002. So the range would be .061 down to [.]057."

Sechrist also performed "confirmatory testing for drug [analysis]." According to Verdino, "usually [they] would perform a blood alcohol analysis

15

first, and then [they] would move on[]to amino assay screening, which is an antigen antibody reaction where [they] would screen the blood and [or] the urine." "[A]fter that [they] would perform what[ is] called a GCMS analysis to confirm any of the drugs that were present." In this case, the confirmatory tests identified "norketamine and fluoxetine" in the blood and "ketamine and fluoxetine" in the urine.

Verdino testified "the natural progression of metabolism is for the ketamine to convert or break down into something called norketamine. That is structurally[, the ketamine] is losing a portion of its structure, and the norketamine represents the remainder of the drug." Norketamine and ketamine "would be normally found in both" urine and blood. Verdino did not have Sechrist's "notes in front of [her]" and was "unsure why [norketamine] was[ not] listed on the report" as having been identified in the urine. Based on her review of Sechrist's notes, Verdino was satisfied "the results reported in" Sechrist's report were "accurate."

On cross-examination, defense counsel established that the lab could have performed a "retrograde BAC [blood alcohol content] extrapolation" to "estimate what the alcohol level in somebody's body was . . . prior [to the time the blood sample was drawn], based on an average metabolism rate." A

16

retrograde extrapolation was not conducted in this case because it was not requested. Also, the testing Sechrist performed only detected the presence of certain drugs. She did not "check for concentration of a specific drug" because that was not requested.

Prior to trial and again during the charge conference, defendant objected to the proposed jury charge and verdict sheet because they incorporated the 2020 amendment to N.J.S.A. 2C:14-2(c)(1). At that time, the court and the parties mistakenly believed the amended statute was effective at the time of the alleged offense. Defendant objected "because it was [not] in the original indictment." He argued "it has to be the old [version of the statute] because . . . that [is] what [the State] charged." The court overruled the objection because the "accusation ha[d] . . . the correct statute."

Defendant also requested the court include the Model Jury Charge (Criminal) "Witness-Failure of the State to Produce," (approved June 14, 2010), commonly referred to as a Clawans[3] charge, because the State did not call B.C. as a witness. Applying the factors set forth in State v. Hill, 199 N.J. 545 (2009), the court denied defendant's request.

---

[3] State v. Clawans, 38 N.J. 162 (1962).

17

It concluded "[f]actor number one, . . . whether the witness is purely within the control or power of only one party, or if there is a special relationship between the party and the witness," weighed in favor of the State because B.C. and J.G. were no longer dating. Factor "[t]wo, that the witness is available to that party both practically and physically[,]" was neutral because "either side could [have] subpoena[ed] that witness." Factor three weighed in the State's favor because B.C.'s testimony would not have "elucidate[d] relevant and critical facts." Factor four, the "testimony appears to be superior to that already utilized[,]" also weighed in the State's favor because "[B.C. was] not in a position . . . and could not testify to" whether J.G. consented to sexual intercourse with defendant. On July 31, 2023, the jury found defendant guilty on both counts in the accusation.

## II.

On January 12, 2024, defendant filed a motion for a new trial contending he "was found guilty of an ex post facto statute" as a result of the court's "misunderstanding . . . about the date of the [2020] amendment" to the sexual assault statute. On March 11, 2024, after hearing oral argument, the court entered an order denying defendant's motion supported by an oral opinion.

The court concluded its

18

confusion at the time of the trial regarding the date of the enactment of the statutory change, is not crucial to the resolution of the issue here.

The verbatim change of the statutory language merely adopted the understanding of the term physical force in the sexual assault statute that had been proscribed by the Supreme Court three decades ago in M.T.S.[4]

The language in the [A]ccusation under which defendant was charged and tried is consistent with the understanding of the sexual assault statute as it existed at the time of defendant's offense. And consistent with how a jury would have been charged at the time of the offense.

The Stat[e] alleged that defendant did not have [J.G.'s] consent to the sexual assault penetration. That theory persisted throughout the course of this case.

The State never alleged nor argued that defendant employed any force in addition to that entailed in the act of sexual penetration. The pre[-]2020 statute did not require it. And nothing about the 2020 amendment changed that understanding.

Frankly, force or physical force under the pre[-]2020 statutory amendment is defined as without the affirmative and freely[-]given permission of the victim as articulated in the [A]ccusation.

The failure of the [A]ccusation to use the term physical force resulted in no adverse consequence to defendant and would not have changed the outcome of

---

[4] State in the Int. of M.T.S., 129 N.J. 422 (1992).

the trial. Therefore, defendant has failed to establish an ex post facto constitutional violation.

Defendant was sentenced to five years in prison subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and Megan's Law reporting requirements pursuant to N.J.S.A. 2C:7-1 to -23, for second-degree sexual assault. His conviction for third-degree criminal sexual contact was merged with the sexual assault conviction. This appeal followed.

III.

On appeal, defendant raised the following points for our consideration.

POINT I

DEFENDANT'S CONVICTION MUST BE REVERSED, BECAUSE THE JURY WAS PRESENTED WITH AN EX POST FACTO STATUTE, IN VIOLATION OF DEFENDANT'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE IV, SECTION VII, PARAGRAPH 3 OF THE NEW JERSEY CONSTITUTION.

POINT II

DEFENDANT'S CONFRONTATION RIGHTS UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, [PARAGRAPH] 10 OF THE NEW JERSEY CONSTITUTION WERE VIOLATED BY THE TESTIMONY OF A SUBSTITUTE ANALYST DESCRIBING ANOTHER ANALYST'S

TOXICOLOGY TEST RESULTS, IN THE SAME MANNER RULED UNCONSTITUTIONAL IN UNITED STATES SUPREME COURT'S DECISION IN <u>SMITH V. ARIZONA</u>, 144 S.CT. 1785 (2024).[5]

POINT III

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING DEFENDANT A <u>CLAWANS</u> CHARGE FOR THE STATE'S FAILURE TO CALL [B.C.] AS A WITNESS.

IV.

We are unpersuaded by defendant's claim that he was convicted based on an ex post facto law. Defendant argues the retroactive application of the 2020 amendment to N.J.S.A. 2C:14–2(c), which was not in effect at the time of the alleged sexual assault in this case, violated the Ex Post Facto Clause of the United States and New Jersey Constitutions. <u>See</u> <u>U.S. Const.</u> art. I, § 10; <u>N.J. Const.</u> art. IV, § 7, ¶ 3. This question is a legal one and our review is de novo. <u>State v. Revie</u>, 220 N.J. 126, 132 (2014).

New Jersey's ex post facto jurisprudence follows the federal jurisprudence. <u>State v. Perez</u>, 220 N.J. 423, 439 (2015) (citing <u>State v. Fortin</u>, 178 N.J. 540, 608 n.8 (2004)). "The Ex Post Facto Clause was intended to

---

[5] 602 U.S. 779 (2024).

interdict the retroactive application of criminal laws that harm the accused." Fortin, 178 N.J. at 608.

"An ex post facto penal law is defined by 'two critical elements . . . it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.'" State v. Natale, 184 N.J. 458, 491 (2005) (alteration in original) (quoting Weaver v. Graham, 450 U.S. 24, 29 (1981)). The United States Supreme Court identified "four categories of laws that violate the ex post facto doctrine if applied retroactively to conduct that occurred before the challenged law was in effect." State v. Bailey, 251 N.J. 101, 122-23 (2022) (citing Carmell v. Texas, 529 U.S. 513, 521-30 (2000) (discussing Calder v. Bull, 3 U.S. 386, 389-91 (1798))). Those categories are:

> (1) "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action"; (2) "[e]very law that aggravates a crime, or makes it greater than it was, when committed"; (3) "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed"; and (4) "[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offen[s]e, in order to convict the offender."
>
> [Id. at 123 (quoting Carmell, 251 N.J. at 522 (emphasis omitted) (quoting Calder, 3 U.S. at 390)).]

A-2049-23

The "fourth category encompasses both 'laws that lower the burden of proof and laws that reduce the quantum of evidence necessary to meet that burden.'" Ibid. (quoting Carmell, 251 N.J. at 541).

Prior to the 2020 statutory amendment and at the time defendant committed the alleged sexual assault, N.J.S.A. 2C:14-2(c)(1) provided:

> An actor is guilty of sexual assault if he commits an act of sexual penetration with another person under any one of the following circumstances:
>
> > (1) The actor uses physical force or coercion, but the victim does not sustain severe personal injury.
>
> [Sex Offenses—Aggravating Circumstances (May 10, 2019) (L. 2019, c. 108, § 1, eff. May 10, 2019).]

More than thirty years ago, our Supreme Court determined the statutory crime of sexual assault defined in N.J.S.A. 2C:14-2(c)(1) did not "require physical force in addition to that entailed in an act of involuntary or unwanted sexual penetration[.]" M.T.S., 129 N.J. at 443.

The Court held:

> any act of sexual penetration engaged in by the defendant without the affirmative and freely-given permission of the victim . . . constitutes the offense of sexual assault. Therefore, physical force in excess of that inherent in the act of sexual penetration is not required for such penetration to be unlawful.

23

. . . .

> The term "physical force," like its companion term "coercion," acts to qualify the nature and character of the "sexual penetration." . . . Hence, as a description of the method of achieving "sexual penetration," the term "physical force" serves to define and explain the acts that are offensive, unauthorized, and unlawful.
>
> [Id. at 444-45.]

The Court concluded "'physical force' as an element of sexual assault . . . requires the absence of affirmative and freely-given permission[.]" Id. at 449. Therefore, in cases

> in which the State does not allege violence or force extrinsic to the act of penetration, the factfinder must decide whether the defendant's act of penetration was undertaken in circumstances that led the defendant reasonably to believe that the alleged victim had freely given affirmative permission to the specific act of sexual penetration.
>
> [Id. at 447-48.]

In such cases, "the State must prove beyond a reasonable doubt that there was sexual penetration and that it was accomplished without the affirmative and freely-given permission of the alleged victim." Id. at 448.

At the time of the trial in this case, the applicable Model Jury Charge stated:

A-2049-23

In order to convict defendant of the [sexual assault], the State must prove the following elements beyond a reasonable doubt:

1.    That defendant committed an act of sexual penetration with another person.

2.    That defendant acted knowingly.

3.    That the defendant used physical force or coercion.

4.    That the victim did not sustain severe personal injury.

Physical force is defined as the commission of the act of sexual penetration without the victim's freely and affirmatively given permission to the specific act of penetration alleged to have occurred.

[Model Jury Charges (Criminal), "Sexual Assault (Force/Coercion) (N.J.S.A. 2C:14-2(c)(1))" (rev. Jan. 24, 2005).][6]

Effective January 21, 2020, the Legislature amended N.J.S.A. 2C:14-2(c)(1) by replacing the words "physical force" with the phrase "without the victim's affirmative and freely-given permission."   N.J.S.A. 2C:14-2(c)(1) currently provides:

---

[6]  After the trial, Model Jury Charges (Criminal), "Sexual Assault (N.J.S.A. 2C:14-2(c)(1)) (certain offenses arising after January 21, 2020)" (approved Aug. 18, 2025) was adopted.

An actor is guilty of sexual assault if the actor commits an act of sexual penetration with another person under any one of the following circumstances:

(1) The actor commits the act using coercion or without the victim's affirmative and freely-given permission, but the victim does not sustain severe personal injury[.]

[Sex Offenses—Assault and Battery (Jan. 21, 2020) (L. 2019, c. 474, § 1, eff. Jan, 21, 2020).]

In this case, the court instructed the jury on the charge of sexual assault in relevant part as follows:

The [A]ccusation provides . . . that [K.W.] on or about July 4[], 2019 in the Township of Woodbridge did commit an act of sexual penetration upon [J.G.] without her affirmatively and freely[-]given permission.

That section of our statutes provides in pertinent part: An actor is guilty of sexual assault if he commits an act of sexual penetration with another person without the victim's affirmative and freely[-]given permission. . . .

In order to convict [d]efendant of the charges, the State must prove . . . beyond a reasonable doubt . . . that [d]efendant committed the act [of sexual penetration] without the victim's affirmative and freely[-]given permission.

. . . .

Now, in determining whether an act of sexual penetration occurred without the victim's freely and

26

affirmatively given permission to the specific act of penetration, you must decide whether the [d]efendant's alleged act of penetration was undertaken in circumstances that led the [d]efendant reasonably to believe that the victim had freely[-]given affirmative permission to the specific act of sexual penetration.

There is no dispute the Accusation, and as a result, the court's jury instruction, referred incorrectly to the statutory language effective January 21, 2020, after the alleged sexual assault in this case. Based on our de novo review, however, we are convinced defendant's claim that the court's instruction required "less or different[] testimony" than the law in effect at the time of the offense lacks merit.

In M.T.S., our Supreme Court established the element of "physical force" in the pre-2020 version of N.J.S.A. 2C:14-2(c)(1) was satisfied if the defendant committed an act of sexual penetration "without the affirmative and freely-given permission of the victim" and that the statute did not "require physical force in addition to that entailed in an act of involuntary or unwanted sexual penetration." 129 N.J. at 443-44. Consistent with M.T.S., the Model Jury Charge applicable to the pre-2020 version of the statute instructed that "[p]hysical force is defined as the commission of the act of sexual penetration without the victim's freely and affirmatively given permission to the specific act of penetration alleged to have occurred."

27                                                          A-2049-23

In this case, the court instructed the jury that the State was required to prove beyond a reasonable doubt "[d]efendant committed the act [of sexual penetration] without the victim's affirmative and freely[-]given permission." Had the court used the correct Model Jury Charge, it would have instructed the jury that the State was required to prove beyond a reasonable doubt defendant used "physical force" defined as "the commission of the act of sexual penetration without the victim's freely and affirmatively given permission."

Under either version of the statute, the State was required to prove exactly the same thing – that defendant committed the act of sexual penetration "without the victim's freely and affirmatively given permission." Nothing more was required under the pre-2020 statute because the statute never required "a showing of force in addition to that entailed in the [act of sexual penetration] itself[.]" M.T.S., 129 N.J. at 444. Because the jury instruction the court gave in this case did not require less or different evidence or testimony than was required under the pre-2020 version of the statute, defendant was not convicted under an ex post facto law.

V.

We are also unpersuaded by defendant's Confrontation Clause argument, which he raised for the first time on appeal. Defendant's claim that his

Confrontation Clause argument could not have been raised at the time of trial is incorrect. Verdino's testimony violated existing New Jersey and United States Supreme Court precedent at the time of trial, and defendant chose not to assert his right to confrontation. Defendant did not object to Verdino's testimony at the time of trial and then strategically used the underlying test results that were the subject of her testimony in support of his defense. As a result, his Confrontation Clause challenge is waived on appeal.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee that, in a criminal trial, the accused has the right "to be confronted with the witnesses against him." The Confrontation Clause "prohibit[s] the use of out-of-court testimonial hearsay, untested by cross-examination, as a substitute for in-court testimony." State ex rel. J.A., 195 N.J. 324, 342 (2008) (discussing Crawford v. Washington, 541 U.S. 36, 51-61 (2004)). The Confrontation Clause guarantees the accused the right to confront "those who bear testimony" against him. Crawford, 541 U.S. at 51 (internal quotation marks omitted). The Confrontation Clause "expresses a preference for the in-court testimony of a witness, whose veracity can be tested by the rigors of cross-examination." J.A., 195 N.J. at 342.

29

In State v. Michaels, 219 N.J. 1 (2014), our Supreme Court, applying and interpreting the United States Supreme Court decisions in Melendez-Diaz v. Massachusetts,[7] Bullcoming v. New Mexico,[8] and Williams v. Illinois,[9] held that "the State's presentation of [a substitute expert's] signed and certified report, based on [their] independent review of machine-generated data, through [their] live testimony, did not violate defendant's confrontation rights." Id. at 45.

In Michaels, the defendant was charged with vehicular homicide and related offenses including driving while intoxicated. 219 N.J. at 5. "Laboratory results of gas chromatography/mass spectrometry tests performed on defendant's blood sample . . . drawn . . . the evening of her motor vehicle accident[] revealed the presence of cocaine, alprazolam . . . and benzoethylene (a cocaine metabolite)." Ibid. "At trial, the State introduced testimony from Edward Barbieri, Ph.D., an assistant supervisor and toxicology technical leader from the private laboratory that had performed the testing on defendant's blood sample." Ibid.

Dr. Barbieri "supervis[ed] the technicians and analysts who were involved in the gas chromatography/mass spectrometry testing." Ibid. He "had reviewed

_____

[7] 557 U.S. 305 (2009).
[8] 564 U.S. 647 (2011).
[9] 567 U.S. 50 (2012).

the machine-generated data from the testing, had determined that the results demonstrated that defendant had certain drugs present in her system, and had certified the results in a report that he had prepared and signed." Id. at 6. Dr. Barbieri testified that based on his "independent review" of "the voluminous machine-generated data[,]" he was "satisfied . . . the testing had been done properly" and was able to "certify the results." Id. at 11.

The Court recognized that Dr. Barbieri's "forensic report [was] 'testimonial' and . . . the type of document subject to the Confrontation Clause." Id. at 6. The Court, however, "concluded that a defendant's confrontation rights are not violated if a forensic report is admitted at trial and only a supervisor/reviewer testifies and is available for cross-examination, when the supervisor is knowledgeable about the testing process, reviews scientific testing data produced, concludes that the data indicates the presence of drugs, and prepares, certifies, and signs a report setting forth the results of the testing." Ibid.; see also State v. Roach, 219 N.J. 58, 82 (2014) (following Michaels and concluding defendant's confrontation rights were satisfied where an independent reviewer reached an independent opinion by creating a DNA profile based on machine-generated raw data).

31

The Court determined this conclusion was consistent with the United States Supreme Court's decisions in Melendez-Diaz and Bullcoming. The Court noted in Melendez-Diaz, the United States Supreme Court found the defendant's confrontation rights were violated because "no witness was offered to support and be cross-examined in respect of the statements contained in the forensic document that was admitted into evidence without live testimony." Michaels, 219 N.J. at 32. Our Supreme Court distinguished Melendez-Diaz, because in Michaels the forensic report "was admitted through the live testimony of Dr. Barbieri, the person who prepared, signed, and certified the report, and Dr. Barbieri was available for cross-examination on his report." Id. at 41.

In Bullcoming, the United States Supreme Court determined the defendant's confrontation rights were violated when "[t]he trial court admitted [a] blood report as a business record . . . during the testimony of [a] . . . scientist who had neither observed nor reviewed the" testing. Id. at 21 (internal quotation marks omitted). Our Supreme Court distinguished Bullcoming because in that case, unlike in Michaels, "a forensic report was admitted into evidence through the testimony of a co-worker who did not observe the work of the analyst who performed the testing, serve as the analyst's supervisor, or certify the results

A-2049-23

obtained by the analyst whose work was contained in the report as a second independent reviewer." Id. at 32.

In Michaels, the State presented "testimony by a supervisor who was qualified as an expert in the relevant subjects, and who analyzed the machine-generated data and produced the certified report in issue." Id. at 42. The Court determined as "the author of the report, it was proper for [Dr. Barbieri] to testify to its contents and to answer questions about the testing it reported." Id. at 43. Importantly, the Court concluded "[t]he fact that Dr. Barbieri was testifying in respect of his own report distinguishes him from the co-analyst in Bullcoming who merely presented a blood alcohol report prepared by another . . . employee." Ibid.[10]

Ultimately, the Court in Michaels concluded defendant's confrontation rights were not violated because "Dr. Barbieri was not repeating the findings and conclusions of the analysts who manned the gas chromatography/mass spectrometry devices. Rather, the findings and conclusions contained in the report and to which he testified were his own." Id. at 45. He "was not parroting the testimonial hearsay of another analyst. Rather, he testified to the findings

---

[10] Our Supreme Court found "Williams's force, as precedent[] at best unclear" because "there [was] no narrow rule that would have the support of a majority of the" court. Michaels, 219 N.J. at 31.

and conclusions that he reached based on test processes that he independently reviewed and verified." Id. at 46.

There is no serious dispute that Verdino's testimony violated the rules set forth in Michaels and Bullcoming. While Verdino independently reviewed the data and agreed with Sechrist's reported conclusions based on the machine-generated data, Verdino impermissibly testified repeatedly about Sechrist's conclusions contained in the report.[11] For example, she testified:

> [Prosecutor]: And when used by . . . Sechrist in this particular case, what results were found?
>
> [Verdino]: Based on this report, I would be assuming which screens were positive, because I do not have the report for the immunoassay in front of me.
>
> [Prosecutor]: . . . Well, then let's deal with this report. What specific information does the report contain?
>
> [Verdino]: So this report, we start with immunoassays. It lists the drugs . . . that we screened the blood and urine matrices for. It also lists that we used a gas chromatograph headspace to analyze the blood alcohol content as well as what[ is] called a gas chromatograph mass spectrometer . . . to confirm the drug content.

_____

[11] The State concedes the "record does not address whether the toxicology results were machine generated." We need not reach that question because Verdino's testimony was improper whether they were or not.

34

Verdino also testified that Sechrist determined the "results of the blood alcohol analysis was 0.059 percent grams per [one hundred] milliliters with an uncertainty of 0.002 grams per [one hundred] milliliters ethyl alcohol." This meant the value of J.G.'s blood alcohol content "would be[ . . . ].059 plus or minus .002. So the range would be .061 down to [.]057."

Unlike the expert in <u>Michaels</u>, Verdino's testimony exceeded her expert opinion and included inadmissible testimony regarding Sechrist's findings in her absence. Because Verdino repeated Sechrist's findings and conclusions and parroted Sechrist's testimonial hearsay, her testimony violated defendant's right to confrontation.

Defendant, however, never objected to Verdino's testimony on that basis. In fact, defendant's only objection was the State did not identify her as an expert at least thirty days before trial and, for that reason, he requested a "hearing . . . to see what her knowledge [was] in this particular case." Following the N.J.R.E. 104 hearing, counsel did not raise any objection to Verdino's anticipated testimony and did not object when she was called as an expert in the field of "toxicology analysis."

Defendant made the tactical decision to use Verdino's testimony in support of his defense. For example, defense counsel confronted J.G. on cross-

examination with the results of the toxicology report that showed her BAC was .059. Counsel then argued in his closing that the legal BAC limit for operating a motor vehicle is higher and asked ".059, how could she be so messed up?"

Counsel used other aspects of Verdino's testimony to argue the State conducted a flawed investigation and to cast doubt on when J.G. ingested the ketamine, implying it could have been before she arrived at defendant's home. Finally, he used the fact that Verdino testified J.G. had Fluoxetine in her blood to argue she was suffering from depression or anxiety and may have self-medicated with ketamine to treat those conditions.

"The right of confrontation, like other constitutional rights, may be waived by the accused." State v. Williams, 219 N.J. 89, 98 (2014). "Defense counsel, many times as a matter of trial strategy, will refrain from objecting to hearsay that may inure to the advantage of the defendant." Id. at 99. It therefore makes perfect sense that "[t]he defendant always has the burden of raising [a] Confrontation Clause objection." Ibid. (quoting Melendez-Diaz, 557 U.S. at 327). Pursuant to Rule 3:10-3(b), a defendant "must specify the grounds for [any objection to the State's expert witnesses], including any Confrontation Clause grounds under either the United States or New Jersey State Constitution."

We are convinced, under the facts and circumstances of this case, defendant waived his right to confrontation. The court conducted an extensive N.J.R.E. 104 hearing before Verdino testified and defense counsel questioned her at length about the substance of her anticipated testimony. Defendant withdrew his objection after Verdino's testimony during the 104 hearing and did not object during Verdino's testimony before the jury. He cannot now be heard to complain because his chosen strategy was unsuccessful.

We are also convinced, had Verdino's testimony not strayed from complying with the requirements of Michaels, there would have been no Confrontation Clause violation based on Smith.

In Smith, the Court held defendant's right of confrontation was violated when the State called a forensic scientist who had no previous connection to the case to testify about his "independent opinion" that samples tested by another analysist were methamphetamine, marijuana, and cannabis. 602 U.S. at 790. The testifying expert based his opinion on "a set of typed notes and a signed report" prepared by the analyst who performed the testing. Ibid. "After . . . telling the jury what [the testing analyst's] records conveyed about her testing of the items, [the testifying expert] offered an 'independent opinion' of their identity." Id. at 791.

The Court determined "the State used [the testifying expert] to relay what [the testing analyst] wrote down about how she identified the seized substance" and the testifying expert "effectively became [her] mouthpiece." Id. at 800. The Court concluded the analyst's notes and report were "out-of-court statements" offered for the truth of what they stated. Id. at 799-800. The Court held "[a] State may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her." Id. at 802-03.

However, the fractured Court was unable to determine if the analyst's notes and report were "testimonial." Id. at 800-02. It, therefore, remanded the matter to the trial court to address whether "the primary purpose of the out-of-court statements" was testimonial. Id. at 802.

Importantly, the United States Supreme Court did not consider in Smith or any other case whether machine-generated data like that at issue in Michaels constitutes testimonial hearsay. See Bullcoming, 564 U.S. at 673 (Justice Sotomayor concurring) (noting "this is not a case in which the State introduced only machine-generated results, such as a printout from a gas chromatograph").

We are convinced our Supreme Court's decision in Michaels remains sound after Smith because it permits a substitute or surrogate expert witness to

38

testify only after forming an independent opinion based on machine-generated data, not conclusions and opinions contained in the notes of a non-testifying analyst. Such reliance on machine-generated data does not run afoul of the Confrontation Clause because machine-generated data is not the equivalent of a testimonial statement.

In State v. Chun, our Supreme Court held "the essential elements of testimonial evidence are a report of a past event, given in response to police interrogation, with the purpose of establishing evidence that a defendant committed an offense." 194 N.J. 54, 147 (2008). Applying that standard, the Court determined the machine-generated report from an Alcotest machine is "not testimonial in the sense that was intended by the . . . Confrontation Clause." Ibid. The court reached that conclusion because the report was "a present, and not a past, piece of information or data," "nothing that the operator does can influence the machine's . . . report of the data," and "the machine has no . . . intent [to establish evidence of guilt] and may as likely generate a result that exonerates the test subject as convicts him or her." Ibid.

The Court in Michaels necessarily reached the same conclusion. The Court held Dr. Barbieri's report was "testimonial, both in his conclusion and in his use of the test results indicating that defendant had specific amounts of

certain drugs in the blood sample[.]" Michaels, 219 N.J. at 44. Yet, the Court permitted Dr. Barbieri to reach his independent opinions based on the underlying machine-generated data. As the Court observed, "defendant could not cross-examine the machines themselves." Ibid.

Likewise, in Roach, the Court concluded it was the "independent interpretation of the machine-generated data [that] converted raw data into unmistakably testimonial material subject to the Confrontation Clause." 219 N.J. at 81. "The subjective analysis involved in creating the DNA profile from the machine-generated graphs marks a clear turning point, at which the raw data becomes testimonial material[.]" Ibid.

Based on our Supreme Court's decisions in Chun, Michaels, and Roach, we conclude machine-generated data is not the equivalent of a testimonial statement. Therefore, when a testifying expert reaches an independent opinion based on machine-generated data created by another person, a defendant's right to confrontation is not violated.[12] Accordingly, if an expert testifies to independent opinions reached based on machine-generated data as permitted by

_____

[12] Of course, as required by Michaels, the State must establish "the testifying witness is knowledgeable about the testing process" and "independently verified the correctness of the machine-tested processes and results." 219 N.J. at 46.

A-2049-23

Michaels, there would not be a Confrontation Clause violation under the rule established in Smith.

In this case, had defendant raised a Confrontation Clause objection to Verdino's testimony and compelled the State to comply with Michaels, there would be no grounds to claim a violation based on Smith. Because defendant failed to object and waived his right to confrontation at the time of trial, he cannot be heard to complain now that his confrontation right was violated based on Smith.

## VI.

Defendant's claim that the court improperly denied his request for a Clawans charge[13] because the State did not call B.C. as a witness is not convincing. We review the trial court's failure to give an adverse inference charge, commonly known as a Clawans charge, under an abuse of discretion standard. State v. Dabas, 215 N.J. 114, 132 (2013).

Under certain circumstances, the State's failure to produce a witness who would "elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him." Clawans, 38

---

[13] Model Jury Charge (Criminal), "Witness – Failure of the State to Produce" (rev. June 14, 2010).

A-2049-23

N.J. at 170. For the inference to be drawn, it must appear that the individual "was within the power of the party to produce and that his testimony would have been superior to that already utilized in respect to the fact to be proved." Id. at 171. The inference is not proper if the individual is unavailable or whose testimony would be "cumulative, unimportant[,] or inferior to what had already been utilized." Ibid. In addition, the "failure to call a witness available to both parties . . . preclude[s] the raising of an inference against either." Ibid.

Thus, in determining whether to give a Clawans charge, the court must set forth on the record its findings on these issues:

> (1) that the uncalled witness is peculiarly within the control or power of only the one party, or that there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (2) that the witness is available to that party both practically and physically; (3) that the testimony of the uncalled witness will elucidate relevant and critical facts in issue[;] and (4) that such testimony appears to be superior to that already utilized in respect to the fact to be proven.
>
> [Hill, 199 N.J. at 561 (quoting State v. Hickman, 204 N.J. Super. 409, 414 (App. Div. 1985)).]

We are convinced the court correctly denied defendant's request for a Clawans charge. The court thoroughly evaluated each of the Hill factors. It found factor one weighed in favor of the State because J.G. and B.C. were no

longer dating. As a result, there was no special relationship between the State and B.C., and B.C. was not peculiarly within the control or power of the State. Relatedly, the court found factor two was neutral because "either side could have subpoenaed" him.

The court determined factor three weighed in the State's favor because B.C. would not have "elucidate[d] relevant and critical facts." B.C. was not in New Jersey on July 4, 2019, and did not personally witness the events before, during, or after the crime was committed. Finally, the court found factor four weighed in favor of the State because B.C. "was not in a position . . . and could not testify to" whether J.G. consented to sexual intercourse with defendant. There is no basis for us to conclude the court misapplied its discretion by denying defendant's request for a Clawans charge.

To the extent we have not addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division